**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARLENE SELLERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06 C 3233 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | Magistrate Judge Susan E. Cox |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Marlene Sellers ("plaintiff"), moves the Court for judgment on the pleadings, to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") or, in the alternative, to remand for further proceedings.[1] Defendant has filed a Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, asking this Court to affirm the Commissioner's final decision. For the reasons stated below, we remand the decision of the ALJ for further findings.

### I. Procedural History

Plaintiff filed for DIB and SSI on April 23, 2004, at the age of 44.[2] Plaintiff alleged a period of disability beginning on October 14, 2003 due to back problems, specifically degenerated discs and a spur on her back.[3] On August 31, 2004, in plaintiff's Request for Reconsideration, she further

---

[1] 42 U.S.C. § 405(g).

[2] R. at 77.

[3] R. at 101.

alleged chronic back pain, both upper and lower.[4]  The Social Security Administration ("SSA")

denied plaintiff's application initially on August 25, 2004 and upon reconsideration on December

3, 2004.[5] Plaintiff then requested an administrative hearing.[6]  On July 27, 2005, administrative law

judge ("ALJ") John E. Meyer held a hearing.[7]  In a decision dated October 21, 2005, the ALJ found

plaintiff not disabled.[8]  That decision became the final decision of the Commissioner when the

Appeals Council denied plaintiff's request for review of the ALJ's decision.[9]  This action followed.

## II.  Facts

### A.  Background

Plaintiff was 45 years old when the ALJ made his determination.[10] She is a high school

graduate.[11] She lives with her husband of 27 years and her eight-year-old grandson.[12] Plaintiff's

relevant work history includes a position as a switchboard operator for four and one-half years with

Nycorp Gas.[13]  Prior to that position, plaintiff worked on a part-time basis, doing clerical work for

---

[4] R. at 45.

[5] R. at 39-53, 330-37.

[6] *Id.*

[7] R. at 345-419.

[8] R. at 20-27.

[9] R. at 5-16.

[10] R. at 350.

[11] R. at 353.

[12] R. at 350-51.

[13] R. at 355-56.

Travelers Insurance for two years.[14]  She also worked as an assembler of telephone parts for AT&T on a full time basis for twelve years.[15]  In her last position plaintiff worked as a counselor and recruiter for the Joilet Job Corps, where she was employed for four years until she filed for DIB and SSI.[16]

## B. Facts Developed At the Hearing and In the Record

On October 15, 2003, while sitting in her home, plaintiff suddenly felt a sensation in her back which resulted in a loss of mobility due to the pain.[17]  At the hearing before the ALJ on October 21, 2003, plaintiff testified that, as a result of this occurrence, she left her job with Joliet Job Corps in October 2003.[18]  She stated that she experiences this type of condition every three to four months and that the extreme pain will last from one to two weeks.[19]  Plaintiff explained that during these episodes when her back goes completely out, it is too painful to move.[20]  At such times, any movement is very painful, even attempting to put one foot in front of the other.[21]  When these episodes occur, she goes to a local hospital emergency room for treatment.[22]

Plaintiff explained that during the episodes she would need assistance from her husband,

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] R. at 357.

[18] R. at 345-55.

[19] R. at 357-58.

[20] R. at 358.

[21] R. at 356-57.

[22] R. at 358.

mother and sons with various tasks, including bathing and moving to different levels of her home.[23]

She also testified that she needed help getting out of bed and dressing.[24]  Similarly, to assist her

mobility, she used a walker and special bathroom equipment.[25]  She could stand for no longer than

30 minutes with the aid of a walker.[26]  Additionally, plaintiff testified that she could not sit for

longer than 30 minutes, after which she must lie down because sitting worsened her pain.[27]  She

explained that she had constant pain in her back, left leg and left arm.[28]  She also recalled that she

was unable to bend over or stoop.[29]  Plaintiff said she could not walk for more than 15 minutes,

could not push or pull with her arms and could carry very little weight.[30]  Plaintiff further testified

that her fingers sometimes went numb.[31]

Plaintiff noted that because her fingers and back bothered her, she did not use a home

computer.[32]  She did, however, use a computer at her previous job.[33]  She also reported that her

---

[23] R. at 363-64.

[24] R. at 375.

[25] R. at 364.

[26] R. at 369.

[27] *Id.*

[28] R. at 369-70.

[29] R. at 370.

[30] *Id.*

[31] *Id.*

[32] R. at 371.

[33] *Id.*

medication caused her to have problems with her memory and she experienced sleepiness.[34] Plaintiff stated that she had no energy and sometimes slept during the day.[35] Plaintiff testified that she cried once or twice a day but had not discussed this with her doctors.[36] Plaintiff did, however, state that she experienced some problems with depression as a result of the drastic change in her lifestyle.[37]

### i. Medical Treatment

Due to spinal problems, plaintiff underwent a surgical fusion in the cervical spine in 1999.[38] Plaintiff testified that after a brief improvement she began to experience neck and lower back pain again.[39]

On September 3, 2003, diagnostic imaging performed showed abnormalities that included degenerative changes at multiple levels of the cervical spine, prominent bony spur formation at C3, C4, C5-C6, and C6-C7, mild spinal stenosis at these levels and a protruding disc at C6-C7.[40] On September 17, 2003, plaintiff saw George E. DePhillips, M.D., for a neurosurgical consultation.[41] Plaintiff complained of worsening pain in the neck, radiating into the left arm and forearm with

---

[34] R. at 379-80.

[35] R. at 389.

[36] R. at 391.

[37] R. at 390.

[38] R. at 365.

[39] R. at 384.

[40] R. at 151-52.

[41] R. at 313.

associated numbness and tingling.[42]  An MRI revealed degenerative disk disease both above and below plaintiff's previous fusion, as well as a left-sided disk herniation at the C6-C7 levels.[43]  Dr. DePhillips recommended conservative treatment and ordered a cervical epidural steroid injection.[44]  On October 17, 2003, plaintiff went to St. Joseph Medical Center for the epidural injection and remained for a 23-hour observation.[45]  Plaintiff testified that this injection did not provide relief.[46]  Following this visit, plaintiff was hospitalized and treated in the emergency room on several occasions for back pain.[47]

On March 29, 2004, plaintiff saw Noam Y. Stadlan, M.D., a neurosurgeon.[48] He concluded that plaintiff had radiculopathy, but no signs of myelopathy.[49]  He suggested that she first try non-surgical options, including physical therapy and traction, but that surgery might be necessary if her symptoms did not improve.[50]

On May 12, 2004, plaintiff went to the emergency room for treatment of pain in her upper neck, occasionally radiating with tingling to the left arm, but causing no numbness or loss of

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] R. at 177-84.

[46] R. at 368.

[47] R. at 358-89, 177-84.

[48] R. at 272-73.

[49] *Id.*

[50] *Id.*

strength.[51] Her neurological report was normal, and she was advised to continue to take her current medications and to return if her symptoms changed or worsened.[52] On May 18, 2004, plaintiff reported to her treating doctor that Demerol only provided minimal relief.[53]

On June 2, 2004, an MRI of plaintiff's cervical spine identified multilevel spondylosis, small disc protrusions and moderate spinal stenosis, but no spinal cord compression.[54] On June 25, 2004, J. F. Zamora, M.D., performed an examination of plaintiff at the request of the SSA.[55] Upon physical examination, Dr. Zamora found muscle spasm and scoliosis in the lumbar spine, low back pain radiating into the legs, neck tenderness and left sided upper extremity numbness.[56] Plaintiff was found to have normal reflexes and sensation.[57] Dr. Zamora also reported that plaintiff's gait was unsteady due to back pain.[58] Additionally, Dr. Zamora noted that, while plaintiff had no difficulty with other tasks, she had severe difficulty with squatting, arising, and hopping on one leg.[59] Dr. Zamora diagnosed disc disease in the cervical spine, cervical radiculitis, possible lumbar disc disease with sciatic radiculitis and possible spondylolistesis.[60] In July 2004, further diagnostic

---

[51] R. at 167.

[52] *Id.*

[53] R. at 214.

[54] *Id.*

[55] R. at 234.

[56] R. at 235.

[57] *Id.*

[58] *Id.*

[59] R. at 236.

[60] R. at 236.

testing was performed, with some abnormalities appearing.[61]  CT scans revealed mild anterior spondylosis and a small left sided protrusion that moderately indents on the thecal sac.[62]  However, no definite spinal cord compression was revealed.[63]  A lumbar myelogram showed mild indentation on the thecal sac at L3-L4.[64]  In addition, a CT myelogram of the lumbar spine was reported to be normal.[65]  Likewise, the intervertebral disc spaces looked well maintained, there was no evidence of protrusion or extrusion at any level, there was no central spinal or foraminal stenosis and, there were no pathologic bony lesions.[66]

In September 2004, treating physician Renaldo A. Jarrell, M.D., recorded that plaintiff had reported that her pain had resolved from July until September 3, 2004, when she leaned over to put something in the oven and experienced an abrupt onset of pain.[67]  Plaintiff reported to Dr. Jarrell that she had been unable to ambulate for two to three days, due to severe back pain.[68]  She was hospitalized for ten days and started on Demerol and Vistaril.[69]  This did not help with the pain, and she was started on a  morphine patient controlled analgesia ("PCA") pump.[70]  Plaintiff was also

---

[61] R. at 158-63.

[62] R. at 159.

[63] *Id.*

[64] R. at 161.

[65] *Id.*

[66] R. at 158.

[67] R. at 212.

[68] R. at 239.

[69] *Id.*

[70] R. at 239.

given an epidural steroid injection and trigger point injections, and she reported improvement after the epidural injection.[71] A CT myelogram showed minimal disc disease at the L4-L5 level.[72] Dr. Jarrell noted that there was a large emotional and psychological component to plaintiff's pain.[73]

During the September hospitalization, laboratory testing also revealed severe anemia.[74] As a result, plaintiff received a transfusion of two units of packed red blood cells and was started on iron supplements.[75] Plaintiff was discharged in stable condition and given instructions to continue outpatient therapy and routine follow-ups with the pain clinic.[76] Plaintiff reported that after the discharge, she was using a walker to ambulate at all times.[77]

On October 15, 2004, plaintiff saw Maen Martini, M.D., for a pain management consultation.[78] Dr. Martini recorded that plaintiff complained of pain in her lower back more than in her neck.[79] She complained of intense pain as a result of any type of movement.[80] Dr. Martini also noted that an extensive workup had revealed cervical changes and some degenerative changes.[81]

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] R. at 239-40.

[77] R. at 210.

[78] R. at 279.

[79] *Id.*

[80] *Id.*

[81] R. at 279.

He also reported that the lumbar spine had mild pathology, but nothing significant.[82] During physical examination, plaintiff was able to tip toe and walk without difficulty.[83] She had limitation of motion in her cervical spine with pain in her arms.[84] Dr. Martini reported that there were no motor or sensory deficits in plaintiff's upper extremities.[85] The examination of her lumbar spine did not reveal any tenderness, trigger points or loss of motor strength or sensation.[86] Dr. Martini diagnosed plaintiff with degenerative disease of the cervical and lumbar spines and prescribed Methadone and Flexeril.[87]

On December 10, 2004, plaintiff saw primary care physician Amanda Pillai, M.D., to get a referral to see a neurosurgeon.[88] Dr. Pillai examined plaintiff and found that she had normal range of motion of the back and negative straight leg raising test but still provided her with a referral.[89]

On February 2, 2005, plaintiff went to the emergency room with complaints of lower back pain.[90] A physical examination revealed paravertebral tenderness, without neurological deficits.[91] Plaintiff was admitted to the hospital for a few days and showed improvement with pain medication

---

[82] *Id.*

[83] R. at 279-80.

[84] R. at 280.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] R. at 242.

[89] *Id.*

[90] R. at 248.

[91] *Id.*

and therapy.[92]

On February 20, 2005, plaintiff returned to the emergency room, complaining of lower back pain that began 30 minutes prior to arrival.[93]  Upon examination, no neurological abnormality was observed, but paravertebral tenderness in the lumbar spine was revealed.[94] Plaintiff was discharged, and her symptoms were mostly relieved once she was given Toradol.[95]

On March 8, 2005, plaintiff was again examined by Dr. Martini.[96]  She reported to him that her prescribed medications were helping to control her pain about 90 percent of the time, and he renewed the prescriptions for Methadone and Flexeril.[97]

Plaintiff returned to the emergency room later that month with complaints of lower back pain.[98]  The episode had begun when her back went out while she was sitting in church.[99]  A physical examination revealed lumbar and thoracic spine paravertebral tenderness, but no neurological deficits.[100]  She was hospitalized for a few days and underwent a series of tests, but no clear etiology for her back pain could be identified.[101]  Therefore, plaintiff asked to be discharged to another

---

[92] R. at 246.

[93] R. at 254.

[94] *Id.*

[95] R. at 254-55.

[96] R. at 277.

[97] *Id.*

[98] R. at 260.

[99] *Id.*

[100] *Id.*

[101] R. at 257.

facility for further evaluation.[102]   An MRI of the lumbar spine taken during this hospitalization

showed no evidence of disc herniation or spinal stenosis.[103]

On March 10, 2005 and on May 8, 2005, Mark Christensen, M.D., examined plaintiff.[104]   In

his treatment records, he opined that plaintiff has chronic pain syndrome without neurological

deficits.[105]

On June 1, 2005, plaintiff returned to the emergency room.[106]   She was treated for lower back

pain that began approximately 30 minutes prior to her arrival.[107]   Physical examination showed

diffuse tenderness in the lumbar spine, and the neurological evaluation was normal.[108]Dilaudid,

Flexeril and Toradol were prescribed, and plaintiff was discharged in stable condition.[109]   Later, in

July 2005, plaintiff consulted with Mauricio Morales, M.D., expressing a desire to become free of

narcotic medications.[110]   Consequently, Dr. Morales perscribed a Catapres patch and Ativan for

her.[111]

---

[102] *Id.*

[103] R. at 300.

[104] R. at 283-84.

[105] *Id.*

[106] R. at 268.

[107] *Id.*

[108] *Id.*

[109] *Id*.

[110] R. at 275.

[111] *Id.*

On August 15, 2005, plaintiff returned to see Dr. DePhillips for a follow- up evaluation.[112] Plaintiff reported to Dr. DePhillips that she was still experiencing neck and lower back pain.[113] An MRI taken revealed disc degeneration at the C3-C4, C5-C6 and C6-C7 levels and degenerative disc disease in the lumbar spine at the L4-L5 and L2-L3 levels, with more severity at the L2-L3 level.[114] Dr. DePhillips noted the possibility of additional physical therapy or surgery, but recommended a trial of bracing for her lower back to help decide whether to consider a spinal fusion.[115]

### ii. Testimony of William Newman, M.D., Medical Expert

William Newman, M.D., an orthopedic surgeon, testified as a medical expert ("ME") at plaintiff's administrative hearing.[116] The ME testified that plaintiff's doctors were mystified as to the cause of her back pain.[117] The ME further testified that he felt he could only "partly," form an opinion as to plaintiff's medical status from the objective medical evidence in the record.[118] He explained that he would want to know plaintiff's current blood count, as her anemia might contribute to her back pain, by making her weak.[119] However, after reviewing all of the medical evidence of record at the time of the hearing, he opined that plaintiff's anatomical and physiological problems

---

[112] R. at 312.

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] R. at 393.

[117] *Id.*

[118] R. at 394.

[119] *Id.*

would not account for her symptoms.[120]  He testified that, based on his review of the record, plaintiff did not have an impairment of listing level severity.[121]  Yet, the ME testified that the conditions that have been revealed in testing would limit plaintiff to sedentary work with no sustained overhead work.[122]

Moreover, the ME testified that there may be something else going on to account for plaintiff's multiple hospitalizations and extreme back pain.[123]  He also commented that he is very concerned about her severe anemia.[124]  The ME testified that the severe anemia itself is a disabling medical condition.[125]  He also noted that he was concerned with her general condition, as her anemia could cause more symptoms than would be expected from the anatomical problems that were documented.[126]  Additionally, he also reported that plaintiff has a large amount of menstrual bleeding and evidence of fibroids, which could be associated with her symptoms.[127]

He further noted that one of the doctors in the emergency room mentioned the possibility of kidney stones.[128]  The ME concluded that the workup done at the time of the hearing was not

---

[120] R. at 397.

[121] R. at 401.

[122] R. at 401-02.

[123] R. at 397-401.

[124] R. at 397.

[125] R. at 399.

[126] R. at 400.

[127] R. at 397-401.

[128] R. at 397.

adequate, through no fault of plaintiff.[129]  He suggested that if plaintiff was examined at a large university hospital, conclusions could be made pertaining to her anemia condition and its related symptoms.[130] He reported that a large university hospital might be able "to look at the whole person and see what's wrong with her."[131]

The ME testified that other factors, including psychological overlay, may be contributing to plaintiff's symptoms.[132] He further acknowledged that plaintiff's condition in its entirety, including depression and weakness, along with the spinal problems, could disable her.[133]

Next, the ME testified that, while plaintiff had complained of memory problems, she had demonstrated adequate memory during the hearing.[134] He also noted that although plaintiff had also reported that she could not sit for very long periods, she sat for about an hour at the hearing.[135]

The ME testified that evidence in the medical records of plaintiff experiencing muscular spasms in the lumbar area was a sign that something was wrong.[136]   He also reported that the medications she used could cause sleepiness.[137]

iii. Testimony of William Schweihs, Vocational Expert

---

[129] R. at 400-01.

[130] R. at 395-97.

[131] *Id.*

[132] R. at 400.

[133] R. at 401.

[134] R. at 403.

[135] *Id.*

[136] R. at 407.

[137] R. at 408.

William Schweihs testified as a Vocational Expert ("VE") at the administrative hearing.[138] The VE opined that plaintiff had an excellent 25-year work history.[139] The ALJ posed a hypothetical question to the VE, directing him to assume that a fictional individual was of plaintiff's age and possessed similar work experience and education.[140] The VE was directed to assume that the individual could: (1) sit or stand for six hours a day; (2) could perform unlimited pushing and pulling; (3) could climb and balance frequently; (4) could stoop, kneel, crouch, and crawl occasionally; and, (5) could not do sustained overhead work.[141] The ALJ explained that the hypothetical individual also should avoid exposure to hazards such as machinery or heights, was unable to move around safely in an unprotected environment, and could use ropes, ladders, or scaffolds occasionally.[142]

The VE testified that the hypothetical individual could perform plaintiff's past relevant jobs, with the exception of the janitorial position, as well as various other jobs.[143] The VE categorized plaintiff's past relevant work, except for the janitorial position, as sedentary work.[144] He also noted that plaintiff would have transferable skills from her past experience to include clerical, data entry, file clerk, and receptionist work.[145]

---

[138] R. at 409.

[139] R. at 411-12.

[140] R. at 413.

[141] *Id.*

[142] *Id.*

[143] R. at 413-14.

[144] *Id.*

[145] R. at 414.

However, the VE stated that if this hypothetical individual was absent for 17 days over the course of ten and a half months, the person would not be able to remain employed.[146] He further noted that the individual would not be able to work if she was off task for more than 10 minutes per hour.[147] Lastly, the VE testified that if the hypothetical person had the symptoms plaintiff described, that person would be unable to work.[148]

### iv. The October 21, 2005 Decision of the ALJ

In the decision dated October 21, 2005, the ALJ found that plaintiff was not disabled and, therefore, not entitled to DIB. [149] The ALJ applied the standard five-step sequential analysis to determining disability for purposes of eligibility for benefits.[150] The ALJ found that the decision of whether plaintiff was disabled could not be made at the first step, because plaintiff had not engaged in substantial gainful activity since the alleged onset date.[151] At step two, the ALJ also found that a decision could not be made, concluding that plaintiff had established the existence of at least one severe, medically determinable impairment based upon the opinions of the reviewing physician consultants.[152] At step three of the analysis, the ALJ found that a decision could not be made, noting that the ME had an opportunity to review the additional medical evidence submitted after the hearing and testified that plaintiff's impairments did not meet or equal in severity, the criteria of any

[146] R. at 416.

[147] R. at 417.

[148] R. at 415.

[149] R. at 20.

[150] R. at 21.

[151] *Id.*

[152] *Id.*

impairment listed in the regulations.[153]

Because the ALJ was unable to make a disability determination in the first three steps, the ALJ then proceeded to assess plaintiff's residual functional capacity ("RFC"). The ALJ noted the definition of RFC, as set forth in the regulations as "the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks."[154] The ALJ noted that in making the assessment, he would consider all of plaintiff's symptoms, including pain, and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of the social security regulations.[155] He further stated that he would consider all medical opinions, which reflect judgments about the nature and severity of the impairments and resulting limitations.[156]

The ALJ relied heavily on the opinion of the ME.[157] The ALJ described the opinion of the ME as "the most informed, consistent with the medical evidence of record and consistent with the record as a whole."[158] The ALJ found that, while the medical evidence of record substantiated some degree of pain, the objective evidence did not reasonably explain the scope and severity of plaintiff's complaints.[159] The ALJ commented that the record contains several indications from the treating medical sources that the cause of plaintiff's symptoms is not clear and that her symptoms are

---

[153] R. at 22.

[154] R. at 22 (*quoting* 20 CFR §§404.1545 and 416.945).

[155] R. at 22.

[156] *Id.*

[157] R. at 25.

[158] *Id.*

[159] R. at 25.

inconsistent with the laboratory findings.[160] The ALJ mentioned that the ME had noted that plaintiff has a lot of menstrual bleeding and evidence of fibroids, conditions which could be associated with back pain.[161] However, based on his analysis of the record, the ALJ concluded that plaintiff had the RFC for sedentary work that did not involve sustained overhead work.[162]

The ALJ also rejected plaintiff's credibility.[163] The ALJ found that plaintiff's testimony, in regard to her symptoms, was not supported by the clinical and laboratory findings of record.[164] He concluded that her assertions were inconsistent because, although plaintiff testified to persistent ongoing pain, she often appeared for treatment complaining of sudden onset of pain.[165] The ALJ noted that in February 2005, plaintiff reported that her pain began a few days prior to admission, and on another occasion the pain occurred 30 minutes prior to admission.[166] He also noted that in March 2005, plaintiff reported that her pain began while sitting in church, and she told Dr. Martini that the medications he prescribed were helping to control her pain about 90 percent of the time.[167] The ALJ concluded that, despite plaintiff's testimony of her limited physical abilities and limited daily activities, her degree of limitation could not be attributed to her medical condition.[168]

---

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] R. at 25.

Moreover, the ALJ rejected the idea that plaintiff may not be able to work because of possible absenteeism problems, despite plaintiff's testimony that she had been hospitalized for 17 days since September of 2004.[169] The ALJ concluded that the evidence did not support this number of hospitalizations, nor did the record document that amount of time in the hospital.[170] He further concluded that, even if that number of hospital days was shown in the evidence, the VE's testimony did not indicate that this level of absenteeism would preclude work.[171] Lastly, the ALJ found that plaintiff's past work as a counselor/recruiter and switchboard operator did not require the performance of work-related activities which are precluded by her RFC.

### III.        Standard of Review

In reviewing the ALJ's decision to deny benefits, the court must determine whether the decision "was supported by substantial evidence or is the result of an error of law."[172] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[173] In reviewing an ALJ's decision, the court is not to decide the facts, reweigh the evidence, or substitute our own judgment for that of the ALJ.[174] However, an ALJ must provide a minimum explanation for his analysis of the evidence so that there is a "logical bridge from the evidence to his conclusion."[175] Yet, the ALJ is not required to provide a "complete written

---

[169] R. at 26.

[170] *Id.*

[171] *Id.*

[172] *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

[173] *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

[174] *Rice*, 384 F.3d at 369.

[175] *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

evaluation of every piece of testimony and evidence."[176]

## IV. Social Security Regulations

To establish a "disability" under the Act, a plaintiff must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[177]   The Social Security Regulations prescribe a sequential five-step analysis for determining whether a claimant is disabled.[178]   In the first four steps the burden is on the plaintiff to show that she: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; and, (4) is unable to perform her past relevant work.[179]   An affirmative answer at step three results in a finding of disability.[180]   If an affirmative answer results at step four, the burden of proof then shifts to the Commissioner at step five to show that other jobs exist in significant numbers in the national economy that the plaintiff could perform.[181]   Testimony from a vocational expert is often sought by the ALJ to assist in a step five determination.[182]

## V. Discussion

---

[176] *Haynes*, 416 F.3d at 626.

[177] *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3rd Cir. 2005).

[178] *Scheck*, 357 F.3d at 700.

[179] *Hughes v. Barnhart*, 59 Fed.Appx. 154, 158 (7th Cir. 2003).

[180] *Rutherford*, 399 F.3d at 551.

[181] *Hughes*, 59 Fed.Appx. at 158.

[182] *Rutherford*, 399 F.3d at 551.

Plaintiff makes various arguments contending that the ALJ's decision is not supported by substantial evidence and must be reversed or remanded. First, she argues that the ALJ erred in basing his finding as to plaintiff's RFC on only portions of the testimony of the ME and on testimony of the ME that was not based on all the evidence. Essentially plaintiff is arguing that, given the testimony of the ME, the ALJ erred in failing to consider the impact of all plaintiff's medically verified impairments. Second, plaintiff contends that the ALJ erred in rejecting her credibility. Third, she argues that the ALJ erred in denying benefits based on the VE's response to a hypothetical question that did not include all of the plaintiff's limitations documented by evidence.

## A.  The ALJ's Consideration of Plaintiff's Impairments

Plaintiff contends that the ALJ based his decision on factual errors, because although the ALJ claimed to have relied heavily on the testimony of the ME in concluding plaintiff's RFC ability, he based his decision on only portions of the ME's testimony. Further, plaintiff argues that the ME's opinion was not based on all the evidence because he did not have certain post-hearing evidence.

### i. Post-hearing Evidence

Plaintiff argues that the ALJ falsely asserted that the ME had an opportunity to review all of the evidence. The ALJ kept the record open after the hearing to allow the parties to request additional time if needed. Additional evidence was in fact submitted by plaintiff's attorney after the hearing and these exhibits are discussed in the "medical treatment" section of this opinion and were also referenced by the ALJ in his decision.[183] Upon review of the record, the Court finds that the ALJ was mistaken in his assertion that the ME had viewed this additional evidence.

---

[183] R. at 22-24.

However, the post-hearing evidence is consistent with the evidence in the record at the time of the hearing.[184] First, the MRIs and neurological exams in the evidence submitted after the hearing do not reveal anything significantly different than the MRIs and neurological exams which were reviewed by the ME.[185] Second, the post-hearing evidence pertaining to plaintiff's anemia condition did not establish any related limitations.[186]

The Seventh Circuit has held that an ALJ is prohibited from construing his own RFC assessment and of "playing doctor" by making his own independent medical findings.[187] However, because the post-hearing evidence is not inconsistent with the evidence in the record at the time of the hearing, which was reviewed by the ME, nor is it inconsistent in any way with the ME's testimony, there is no reasonable basis to conclude that the ME's opinion would have changed in any way if he had reviewed this evidence.[188] Further, the additional evidence does not in any way answer the questions the ME had in regard to alternative explanations for plaintiff's symptoms.[189] It is also evident from the record that the ALJ gave consideration to the post-hearing evidence.[190] Thus, while recognizing that the ALJ was mistaken when he asserted that the ME had viewed the additional evidence, this is a harmless misstatement.

---

[184] R. at 167, 242, 248, 260, 280, 283-84.

[185] *Id.*

[186] *Id.*

[187] *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

[188] R. at 167, 242, 248, 260, 280, 283-84.

[189] R. at 167, 242, 248, 260, 280, 283-84.

[190] R. at 22-24.

ii.  The ALJ's Reliance on the ME's Testimony

Plaintiff next argues that the ALJ erred by basing his decision on only portions of the ME's testimony.  Plaintiff contends that the ALJ disregarded the ME's testimony concerning the other conditions present, which could cause additional limitations or exacerbate her current symptoms, causing her to be disabled.  Plaintiff particularly points to the ME's testimony concerning her condition of severe anemia, contending that the ALJ erred by failing to consider her anemia throughout the disability determination.

An ALJ is required to consider any impairment that is apparent from the medical records or which a claimant says he has.[191]  Further, an ALJ is required to consider the combined effect of all the plaintiff's ailments, "regardless of whether any such impairment, if considered separately, would be of sufficient severity."[192]  While plaintiff did not claim anemia as an impairment when filing her disability report, the medical evidence in the record and testimony of the ME should have alerted the ALJ that plaintiff may have another relevant impairment that could contribute to the cumulative effect of her other impairments.

The Seventh Circuit has held, in several cases where an ALJ failed to expressly consider a plaintiff's additional impairment, that the impairment was indirectly factored into the ALJ's decision as part of a doctor's opinion.[193]  This case, however, can be distinguished because, in contrast to

---

[191] *See Rutherford*, 399 F.3d at 553 (holding that an ALJ is required to consider impairments plaintiff says he has, or about which the ALJ receives evidence, despite the fact that the plaintiff did not specifically claim obesity as an impairment, where the references to plaintiff's weight in his  medical conditions were sufficient to alert the ALJ to the impairment); *See also Clifford,* 227 F.3d at 870 (holding that the ALJ, where confronted with an obviously obese applicant, should have considered the weight issue with the aggregate effect of her other impairments).

[192] *Clifford*, 227 F.3d at 873.

[193] *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006).

such cases, the ME in the case at hand directly states that he is concerned with plaintiff's anemia, and that he would like to review additional medical evidence before forming an opinion as to plaintiff's anemia as a possible significant aggravating factor to her limitations.[194]  He explicitly testified that he felt he could only "partly," from the objective medical evidence in the record, form an opinion as to plaintiff's medical status.[195]  Further, he suggested that if plaintiff was examined at a large university hospital, conclusions could me made pertaining to her condition of severe anemia and its related symptoms.[196]  Thus, the case at hand is different from cases where the Seventh Circuit has held that the ALJ adopted the limitations suggested by the reviewing doctor and experts, who were aware of the plaintiff's additional impairments and based their conclusion on such knowledge.[197]

The Seventh Circuit has also held that an ALJ need not address every aspect of the record in his decision.[198]  However, an ALJ is required to consider the plaintiff's "medical situation as a whole."[199]  An ALJ must also build "a bridge from the evidence to his conclusion."[200]  Further, an ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability."[201]  Also, an ALJ cannot, without providing adequate explanation, ignore a medical opinion which has

---

[194] R. at 394-99.

[195] R. at 394.

[196] R. at 395-97.

[197] *Prochaska*, 454 F.3d at 736.

[198] *Sims*, 309 F.3d at 429.

[199] *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004).

[200] *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002).

[201] *Clifford*, 227 F.3d at 870.

not been contradicted.[202]

In addition to listing anemia, the ME further mentioned that other factors, including psychological overlay, may be contributing to plaintiff's symptoms.[203]  Moreover, he testified that plaintiff's condition in its entirety, including depression and weakness, along with spinal problems, could disable her.[204]  Finally, he commented that the medications plaintiff used could cause sleepiness.[205]

The ALJ held that, in finding plaintiff not disabled, he looked predominantly at the medical evidence in the record and plaintiff's medically diagnosed anatomical and physiological problems, and to the opinion of the ME.[206]  In reality, the ALJ focused solely on the portions of the medical evidence and opinion of the ME that addressed the condition of plaintiff's spine.[207]  In his decision the ALJ simply commented that the medical evidence of record did not provide an explanation for plaintiff's reported symptoms.[208]  The ALJ noted that the ME, after reviewing all of the medical evidence, reported that there was little medical documentation to show causations for plaintiff's reported symptoms.[209]  The ALJ mentioned that the ME reported that plaintiff had a lot of menstrual

---

[202] *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

[203] R. at 399.

[204] R. at 401.

[205] R. at 408.

[206] R. at 23-25.

[207] R. at 23-25.

[208] *Id.*

[209] *Id.*

bleeding and evidence of fibroids, which could be associated with low back pain.[210]  Yet, in his

decision the ALJ did not address the ME's report as to these symptoms.  Therefore, in this case the

bridge from the evidence to the conclusion is not present because, without stating grounds for doing

so, the ALJ essentially disregarded the portion of the ME's testimony and the medical evidence

indicating that there could be other conditions present that could have contributed to plaintiff's

symptoms and caused additional functional limitations.

Defendant argues that plaintiff bore the burden of proving the nature and extent of her

conditions and failed to do so.  Although the ME's testimony does not establish that anemia or

plaintiff's medications accounted for her limitations, it did put forth that limitations may occur with

patients with anemia and that plaintiff's medications could cause sleepiness.[211]  The ME also noted

that the inadequacy of the workup done at the time of the hearing was not the fault of plaintiff.[212]

In light of this, it is unclear why the ALJ did not request further and more comprehensive medical

testing.  Where an ALJ believes that he lacks sufficient medical evidence to make a decision as to

a plaintiff's disability, he must adequately develop the record.[213]  Thus, because the record does not

indicate that the ALJ considered the aggregate effect of all of plaintiff's impairments or the lack of

medical evidence as noted by the ME, the Court finds that this case should be remanded to allow

the ALJ to request additional testing and to address plaintiff's other conditions in determining her

limitations.

---

[210] *Id.*

[211] R. at 399-408.

[212] R. at 400-01.

[213] *Clifford*, 227 F.3d at 873.

B. The ALJ's Credibility Determinations

Plaintiff argues that the ALJ improperly discredited her explanation of her symptoms. Plaintiff reasons that the ALJ erred in rejecting her credibility because: (1) she is a person with a long term, excellent work record; (2) she consistently and aggressively pursued medical treatment; and, (3) her doctors continued to prescribe treatment on an ongoing basis.

An ALJ is in the best position to determine a witness's truthfulness and forthrightness, thus, his credibility determinations will be given "special deference."[214] Therefore, a court will not disturb an ALJ's credibility findings unless they are "patently wrong."[215] An ALJ's credibility determination must be affirmed "as long as the ALJ gives specific reasons that are supported by the record for his finding."[216]

The Seventh Circuit has held that if a plaintiff's allegation of pain is not supported by the objective medical evidence in the record, and the plaintiff testifies that pain is a significant factor of his or her alleged inability to work, then the ALJ must "investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties."[217] Under the binding case law, an ALJ must also consider factors such as "the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief

---

[214] *Powers v. Apfel*, 207 F.3d 431, 432 (7th Cir. 2000).

[215] *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

[216] *Skarbek,* 390 F.3d at 504.

[217] *Clifford*, 227 F.3d at 872.

of pain, function restrictions, and the claimant's daily activities."[218]  Further, when an ALJ is determining the credibility of a plaintiff's testimony, the ALJ must "consider the entire case record."[219]  Lastly, while an ALJ "may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the officer may consider that as probative of the claimant's credibility."[220]

The ALJ found that while the medical evidence of record documented complaints of pain, the objective evidence did not reasonably explain plaintiff's symptoms.[221]  The ALJ concluded that plaintiff's assertions were inconsistent because, although plaintiff testified to persistent ongoing pain, she often appeared for treatment complaining of sudden onset of pain.[222]  The ALJ concluded that, despite plaintiff's testimony of her limited physical abilities and limited daily activities, her degree of limitation could not be attributed to her medical condition.[223]

The ALJ failed to adequately consider the possibility of various other factors contributing to plaintiff's symptoms in his credibility determination.  Under the binding case law, for the ALJ's decision to be consistent with the medical evidence of record and consistent with the record as a whole, he is required to consider all possible factors contributing to plaintiff's symptoms.  This court lacks a sufficient basis upon which to uphold the ALJ's credibility determination.  On remand, the ALJ should re-evaluate plaintiff's complaints of pain, considering all aspects of the medical

---

[218] *Id.*

[219] 20 C.F.R. § 404.1529(c)(3).

[220] *Powers*, 207 F.3d at 435.

[221] R. at 25.

[222] *Id.*

[223] *Id.*

evidence of record along with additional medical evidence pertaining to possible aggravating factors of plaintiff's symptoms.

### C. The ALJ's Consideration of the VE's Testimony

Lastly, plaintiff argues that the ALJ erred in denying the claim based on the VE's response to a hypothetical question that did not include all the limitations documented by the record. The ALJ concluded that the record did not document the amount of time in the hospital necessary to preclude plaintiff from working, nor did the VE's testimony indicate that the mentioned level of absenteeism would preclude work.

First, there is no rule in the Social Security Act that grants disability benefits if a claimant spends a specific number of days in a hospital. Plaintiff appeared numerous times in the emergency room, but where the medical evidence does not show that the plaintiff was incapable of working, the fact that she was repeatedly treated in the emergency room does not need to be given substantial weight. Therefore, in regard to this issue, the Court finds no error on the part of the ALJ.

### VI.  Conclusion

For the reasons set forth above, the Commissioner's motion for summary judgment is denied (dkt 25 ) and plaintiff's motion for judgment on the pleadings is granted, in part (dkt 19 ). Pursuant to sentence four of 42 U.S.C. § 405(g), this case is remanded in part for the purpose of ordering further testing and to further consider how existing medical evidence (and any further evidence developed) may demonstrate a medically direct link from plaintiff's additional impairments to her symptoms. Any harmless error need not be addressed on remand.

**IT IS SO ORDERED.**

Date: <u>March 17, 2008</u>

_____
U.S. Magistrate Judge
Susan E. Cox